UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LILLIAN C. RIERA                              CIVIL ACTION

VERSUS                                        NUMBER: 17-8694

NANCY A. BERRYHILL, ACTING                    SECTION: "A"(5)
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying Plaintiff's application for Disability Insurance Benefits ("DIB") and her concomitant request for Medicare Part A coverage under the Social Security Act. (Rec. docs. 15, 16).

Lillian C. Riera, Plaintiff herein, filed the subject application for DIB on October 23, 2014, alleging disability as of November 2, 2010. (Tr. pp. 117-118). In a "Disability Report-Adult" form that appears in the administrative record below, the conditions limiting Plaintiff's ability to work were identified as kidney cancer causing the loss of one such organ, radiation damage to the spine, chronic pain issues due to radiation damage, a fusion to the back to stabilize the damage, and osteoporosis. (Tr. p. 148). Plaintiff's application for DIB was denied at the initial level of the Commissioner's administrative review process on May 13, 2015. (Tr. pp. 83-86). Pursuant to Plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on March 11, 2016 at which Plaintiff, who was unrepresented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 115-116, 114, 49-73). On April 20, 2016, the ALJ issued a written decision in which he

concluded that Plaintiff was not disabled and was thus not entitled to Medicare coverage under the Social Security Act. (Tr. pp. 11-27). The Appeals Council ("AC") subsequently denied Plaintiff's request for review of the ALJ's decision on May 4, 2017, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 4-8). It is from that unfavorable decision that the Plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

In her *pro se* cross-motion for summary judgment, Plaintiff broadly challenges the sufficiency of the evidence supporting the Commissioner's decision, attaching to her complaint a number of medical records that pre-date and post-date the ALJ's decision. (Rec. doc. 1, pp. 27-80). Relevant to the resolution of Plaintiff's challenge are the following findings that were made by the ALJ:

1. The claimant does not meet the insured status requirements for purposes of entitlement to disability insurance cash benefits, but she does meet the special insured requirements for Medicare purposes through June 30, 2017, based on her Medicare qualified government employment.

2. The claimant has not engaged in substantial gainful activity since November 2, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease, gastroesophageal reflux disease (GERD), and history of nephrectomy. The claimant has the following non-severe impairment: hypothyroidism (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except frequent climbing of ramps and stairs; occasional climbing of ladders, ropes, and scaffolds; and occasional balancing, stooping, kneeling, crouching, and crawling.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on August 8, 1963 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.   The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 2, 2010, through the date of this decision (20 CFR 404.1520(g)).

(Tr. pp. 16, 17, 18, 22, 23).

Judicial review of the Commissioner's decision to deny DIB is limited under 42 U.S.C. §405(g) to two inquiries:   (1) whether substantial evidence of record supports the Commissioner's decision and (2) whether the decision comports with relevant legal standards.  *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir. 2000); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.   42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial

3

evidence is more than a scintilla, less than a preponderance, and is such relevant as a reasonable mind might accept as adequate to support a conclusion. *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues *de novo*, nor may it substitute its judgment for that of the Commissioner. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts. *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB bears the burden of proving that she is disabled within the meaning of the Social Security Act. *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. *Harrell*, 862 F.2d at 475. In making this determination, the Commissioner uses the five-step sequential analysis set forth in 20 C.F.R. §§404.1520, as follows:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings;

2. An individual who does not have a "severe impairment" will not be found to be disabled;

3. An individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors;

4. If an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made; and,

5. If an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate the she is unable to perform the work that she has done in the past. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 2294 n. 5 (1987). If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. *Fraga*, 810 F.2d at 1304 (citing *Lawler v. Heckler*, 761 F.2d 195, 198 (5th Cir. 1985)). Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); *Fraga*, 810 F.2d at 1302.

The documentary evidence admitted in the administrative proceedings below begins with records from the Thibodaux Regional Medical Center ("TRMC") where Plaintiff was admitted and underwent an anterior lumbar interbody fusion on November 3, 2010 for treatment of L5-S1 spondylolisthesis, grade I. (Tr. pp. 256-257, 289, 291-292). Plaintiff tolerated the procedure well and was released three days later, fully ambulatory and tolerating a normal diet. (Tr. p. 254). Post-operatively, Plaintiff was seen by her co-surgeon, Dr. Thomas Donner, on November 19, 2010, who remarked that "[h]er back feels great" and that she was "...doing fine except for mild sciatica on the right which is improving day by day." Plaintiff was given activity instructions and a prescription for Valium to counter tightness to muscles in the back and mild sciatica that were interfering with her sleep. (Tr. p. 245). X-ray studies of the lumbar spine were done on December 6, 2010, revealing no complications related to the recent fusion. (Tr. p. 290). Plaintiff returned to Dr. Donner the

following day and appeared to be "... doing quite well" with only "rare and very brief sciatica" in the right leg that was diminishing.  With continued improvement, it was hoped that use of a supportive back brace could be discontinued in four weeks.  (Tr. p. 246).

On December 21, 2010, Plaintiff was seen at the Lady of the Sea Medical Center for follow-up surgical care and to have medical-leave paperwork completed.  She complained of pain at the tailbone near the site where screws had been installed.  The assessment was back pain status post surgery.  (Tr. p. 347).  Plaintiff noted continued coccygeal pain, especially at night, when she was next seen by Dr. Donner on January 4, 2011.  Otherwise, there were no symptoms affecting the leg and it was hoped that the tailbone pain would ultimately resolve. A follow-up CT scan was to be performed in one month.  (Tr. p. 247).  That study went forward on February 3, 2011 and revealed the interval anterior fusion at L5-S1 and results otherwise consistent with a prior test that had been conducted on September 21, 2010.  (Tr. pp. 252-253).

Plaintiff was described as doing "much better" when she returned to Dr. Donner on February 7, 2011 with some periodic but diminishing achiness in the coccyx and rare, extremely mild sciatica-type symptoms that were not significant enough to require treatment.  The results of the recent CT scan showed the fusion to be solid.  Plaintiff was to continue physical therapy with the hope that she would be released to work in six weeks. (Tr. p. 248).  Plaintiff was seen again at Lady of the Sea on March 14, 2011 for a wellness and routine annual physical, bloodwork, and medication refills.  She was hoping to return to work in the near future as the fusion was said to have "cured" her back pain and only occasional pain remained.  (Tr. pp. 345-346).  When Plaintiff was seen again by Dr. Donner on March

17, 2011, she was characterized as "doing great" and was thus issued a requested work release and was to return to the clinic as needed. (Tr. p. 249).

On April 25, 2011, Plaintiff reported minimal coccygeal soreness from time to time and was prescribed Soma to manage the discomfort. (Tr. p. 250). At a follow-up pain management appointment at Lady of the Sea on May 13, 2011, Plaintiff indicated that she needed pain medication on some days but not others and that the medication did allow her to walk upwards of two miles. Pain management options were discussed. (Tr. p. 344). Plaintiff was "doing well" with only activity-related, intermittent coccygeal pain on August 1, 2011, reporting that she had been taking Soma about once per week and that with rest, her symptoms were minimal to absent. In keeping with Plaintiff's wishes, Dr. Donner cleared her to return to work but recommended that she avoid lifting over 30 pounds to minimize her coccygeal pain. Plaintiff was to return on an "as needed" basis. (Tr. p. 251). She was counseled on weight-loss exercises following bloodwork on October 10, 2011. (Tr. p. 343).

Plaintiff was seen at Lady of the Sea for further follow-up on December 15, 2011 and reported insomnia on some nights. The dosage of Duragesic was increased. (Tr. p. 336). On that same date, one of Plaintiff's treating physicians, Dr. Camille Pitre, completed various forms in connection with Plaintiff's participation in the Teachers' Retirement System of Louisiana ("TFSL"), including an "Application for Disability Retirement," a "Physician Certification," and a "Physician Report of Disabling Condition" form. On those forms, Dr. Pitre recalled having treated Plaintiff since August 30, 1993 for a history of kidney cancer, treated with radiation, which resulted in significant side-effects, disc degeneration/osteoarthritis, bowel scarring with intermittent obstruction, chronic scoliosis, chronic backpain requiring narcotics, and depression. In the doctor's opinion, Plaintiff was

7

unable to return to her work as a nurse due to the medications that she was taking and was unable to perform any other occupation. The doctor also indicated that Plaintiff had never been cleared to return to work. (Tr. p. 339). (Tr. pp. 262-263). Another related form was completed by one of Plaintiff's other treating physicians, Dr. Truett Ray, on January 8, 2012 but only the first page of the two-page form appears in the administrative record below. (Tr. p. 303).

On March 1, 2012, Plaintiff was seen again at Lady of the Sea for a fever, body aches, headaches, and other flu-like symptoms. The assessment was flu syndrome/fever; Phenergan was prescribed. (Tr. p. 334). Following bloodwork, Plaintiff was assessed with low back pain, elevated cholesterol, and Sweets Syndrome on May 11, 2012. The dosage of Duragesic was adjusted and Pravachol and Clobetasol were prescribed. (Tr. p. 333). On August 7, 2012, Plaintiff expressed a desire to be weaned off of the Duragesic Patches. The assessment was spondylolisthesis/chronic pain; Prozac was substituted for Celexa. (Tr. p. 332). Plaintiff was seen again by Dr. Pitre on December 4, 2012 who noted that she was doing well on MS Contin. The assessment was low back pain status post surgery. Plaintiff was continued on MS Contin and Morphine Sulfate. (Tr. p. 330). Dr. Pitre completed a "Continuing Disability Claim Form – Physician's Statement" on that same date, indicating that Plaintiff was permanently disabled as of November 14, 2011 due to spondylolisthesis and chronic pain. (Tr. p. 331). At a yearly wellness exam on February 7, 2013, Plaintiff was said to be doing well on her medications. Exercise activity was limited but regular in the form of 15-minute walks twice per week. (Tr. pp. 327-329).

Plaintiff was seen again by Dr. Pitre on May 27, 2013 who indicated that her medication regimen worked well in controlling her lower back pain. The assessment was

chronic lower back pain status post radiation for cancer/scoliosis. Plaintiff was to continue on Morphine Sulfate Extended and Instant Relief medications to manage her symptoms. (Tr. p. 326). Plaintiff returned to Dr. Pitre for a check-up, medication refills, chronic pain, and paperwork completion on August 5, 2013. The assessment was chronic lower back pain and Plaintiff was maintained on her medications. (Tr. p. 359). Dr. Pitre also submitted the Annual Report required by the TRSL, again certifying that Plaintiff was completely disabled from performing her past occupation or any other occupation. (Tr. pp. 264-265).

Plaintiff presented to Dr. Pitre again on November 4, 2013 with complaints of a cough and nausea/vomiting. Her pain at the time was rated as a "3" and she reported that her medications were working well. Upon physical examination, Plaintiff had normal motor strength and tone with no abnormalities of the joints, bones, or muscles, normal movement of all extremities, and only trace edema. The assessment was degeneration of an intervertebral disc, hypothyroidism, hyperlipidemia, gastroesophageal reflux disease with an hiatal hernia, and a cough. She was administered an influenza vaccination and was to return in three months. (Tr. pp. 362-367). By the time of that follow-up visit on February 10, 2014, Plaintiff was described as "doing well" and the results of a physical examination were largely unremarkable except for the appearance of thoracolumbar scoliosis. The assessment was degeneration of an intervertebral disc, chronic pain, gastroesophageal reflux disease with an hiatal hernia, and a routine health examination. Once again, Plaintiff was to return in three months. (Tr. pp. 368-373).

On May 12, 2014, Plaintiff returned to Dr. Pitre for medication refills, again being described as "doing well," ambulating normally, and being in no acute distress. The assessment was largely the same as the previous visit except for the addition of

hyperlipidemia and hypothyroidism. A mammogram was to be scheduled. (Tr. pp. 374-380).

By September 10, 2014, Plaintiff was again said to be doing well, having discontinued the use

of Vicodin, taking Soma only rarely, and taking MS Contin as needed. She was also weaning

off Prozac. The assessment was degeneration of an intervertebral disc, hyperlipidemia,

gastroesophageal reflux disease with an hiatal hernia, a history of nephroblastoma, Sweet's

Disease following an infection, pityriasis versicolor, and candidiasis of the skin. Medications

were prescribed. (Tr. pp. 381-386). Plaintiff's next visit to Dr. Pitre on December 8, 2014

was for, *inter alia*, treatment of a rash that was resolving on its own and was unaccompanied

by itching. The assessment was hypothyroidism and degeneration of an intervertebral disc

but no adverse findings were noted on physical examination. (Tr. pp. 387-391). Bloodwork

was done to monitor the effectiveness of Plaintiff's medications. (Tr. pp. 437-448).

The next medical records document Plaintiff's follow-up visit to Dr. Pitre on March

11, 2015. She was said to be "doing well" except for a sore throat and dry cough. Plaintiff

indicated that her pain was worse with cold and rainy weather and she expressed an interest

in trying Duragesic Patches again. The results of a physical examination were largely

unremarkable. The assessment was a routine adult health examination and chronic pain.

Plaintiff was given a refill on her various medications, including Immediate and Extended

Release Morphine. (Tr. pp. 416-423, 432-436).

On March 31, 2015, Plaintiff was consultatively evaluated by Dr. Douglas Davidson,

her chief complaint being chronic pain due to the past effects of radiation treatment. Plaintiff

recalled a history of a right nephrectomy, radiation therapy, and chemotherapy following the

discovery of a Wilms' tumor in 1968. In her adult years, she began having lower back pain

and had numerous abdominal surgeries for bowel obstruction secondary to radiation

damage and adhesions.  Plaintiff later developed urinary retention and before her lumbar fusion in 2011, she was reportedly wheelchair-bound and was catheterizing herself.  In the "History of Present Illness" portion of his report, Dr. Davidson related that Plaintiff's fusion surgery was helpful in that it restored her ability to walk as well as some bladder control. Since then, Plaintiff had trained herself to void on demand but she still had to catheterize herself on occasion.  Plaintiff had also developed osteoporosis and scoliosis as a result of the radiation damage to her spine.  Although she no longer had tingly and numb feet, Plaintiff reportedly lived with constant lower back pain that was worsened with any activity, even standing or walking, as well as pain-related insomnia.  Plaintiff had tried but was unable to return to work after her surgery and she took pain medications irregularly and as sparingly as possible.  Otherwise, Plaintiff felt "pretty good" with no loss of energy or appetite changes.

Upon physical examination, range of motion of all joints except the lumbar spine was normal and there was no trigger point tenderness on palpation.  Although straight leg raising was positive bilaterally, there was no tenderness or swelling of the knees, with good stability, and the ankles, feet, and toes were non-tender and stable.  Grip strength was 5/5, tandem walking could be done at a good pace, and transitioning from a standing to a sitting position and from a sitting to a lying position could be accomplished easily and without any difficulty. Plaintiff could also walk on heels and toes.  A mental-status examination was unremarkable. Dr. Davidson's impressions were:   1) chronic low back pain secondary to L5-S1 anterolisthesis, levorotoscoliosis, and spondylosis with L5-S1 neuropathy, a neurogenic bladder, and status post L5-S1 fusion; 2) elevated blood pressure but with no diagnosis of hypertension; 3) an hiatal hernia with GERD; 4) hypothyroidism; 5) diverticular disease; 6) hypercholesterolemia; 7) osteoporosis; and 8) a remote Wilms' Tumor in 1968 with right

nephrectomy, radiotherapy, and chemotherapy.  Functionally, Plaintiff was able to sit, stand, and walk and to do exertional activities as tolerated.  She was also able to lift/carry or push/pull 10 to 20 pounds and to use her hands for repetitive action, fine manipulation, and all grasping.  Operation of foot pedals was not affected.  Plaintiff could not bend but was able to squat, stoop, crouch, kneel, crawl, balance, climb, twist, reach, and turn.  Eye-hand coordination, cognitive skills, and concentration were all normal.  Plaintiff was additionally able to drive, travel, and to do all "appropriate activities" consistent with the foregoing capabilities and limitations.  (Tr. pp. 399-403).

Plaintiff was seen again by Dr. Pitre on July 10, 2015, for a cough and congestion, medication refills, and follow-up for lower back pain and anxiety.  The assessment was low back pain, anxiety, and acute bronchitis; various medications were prescribed and refilled. (Tr. pp. 410-415).  On that same day, Dr. Pitre completed the two-page form required for Plaintiff's continued participation in the TRSL.  There, Dr. Pitre checked off the appropriate box on the form to indicate that Plaintiff was unable to return to full-time work, without restrictions, in the same field in which she had been employed in the past and that her chances of recovery were highly improbable.  (Tr. pp. 466-467).  The final piece of documentary evidence consists of post upper GI instructions dated December 30, 2015 during which the attending physician discovered gastritis, an hiatal hernia, and esophageal dilation.  Plaintiff was prescribed Carafate and additional testing and consultations were scheduled.  (Tr. p. 468).

As noted earlier, a hearing *de novo* before an ALJ went forward in this case on March 11, 2016.  After being duly advised of her right to legal assistance, Plaintiff chose to proceed without the benefit of an attorney or other representative, executing a form that

memorialized her election in that regard.  The documentary exhibits were then formally admitted into evidence and Plaintiff took the stand.  She testified that she had attempted to return to nursing work subsequent to the alleged disability onset date of November 2, 2010 but was unable to withstand the rigors of full-time employment.  In addition, her nursing license did not allow her to work in that field while taking narcotic pain medications.  When asked why she believed that she was disabled, Plaintiff testified to chronic pain problems that began following radiation treatments for a Wilms' Tumor that was diagnosed in her earlier years.  Plaintiff admitted that since she was no longer working on a full-time basis as a nurse, she was able to take her prescribed pain medications more regularly and had thus experienced a better quality of life.  On a personal level, Plaintiff was divorced, lived by herself, and relied on her son or other family members for transportation when she was unable to drive as a consequence of taking her extended release pain medication.  On those days on which she was experiencing "break through" pain requiring immediately-acting pain medication, she was essentially rendered bedridden.

Continuing, Plaintiff testified that her extended release pain medications allowed her to cook, do laundry, go grocery shopping, and to sit, stand, and walk upwards of half of a mile. However, lifting objects of 30 pounds or more was problematic.  Plaintiff was receiving no mental health treatment at the time of the hearing but she had done so at times in the past. When directed to the two times that she had been medically released to return to work, Plaintiff testified that she had attempted to do so but was unsuccessful.  Plaintiff further explained that several examination reports that documented unremarkable findings were not unsurprising given that she was taking Morphine at the time which increased her functionality in the activities of daily living.  The ALJ then reminded Plaintiff of the obligation

13

imposed upon Social Security claimants to take the medications that had been prescribed to them and the requirement that a claimant be unable to perform any work, not just the work that he or she has done in the past, in order to be found disabled.  Plaintiff admitted that she had not actively looked into doing work other than nursing and that she had already been receiving disability payments under the TRSL.  In response, the ALJ noted that disability under the Social Security Act is determined under standards different from those applicable to other systems like the TRSL or the Department of Veterans Affairs.  (Tr. pp. 51-67).

Todd Capielano, a VE, was the next witness to take the stand.  He began by classifying the exertional and skill demands of Plaintiff's past work as a medical/surgical nurse and a school nurse.  The ALJ then posed a hypothetical question to the VE which assumed an individual who could perform light-level work with frequent climbing of ramps and stairs; occasional climbing of ladders, ropes, and scaffolds; and, occasional balancing, stooping, kneeling, crouching, and crawling.  With that profile in mind, the VE testified that the individual described in the hypothetical question could theoretically perform Plaintiff's past work as a school nurse.  However, neither of the past nursing positions could be performed if the individual required narcotic pain medication to function.  When asked to identify other light-level jobs that the hypothetical individual could perform, the VE identified the positions of security monitor, cashier, and marking clerk, with significant numbers of such jobs existing in the national and local economies.  In response to the ALJ's inquiry, Plaintiff testified that she had not had to self-catheterize for approximately a year since leaving the job market and being more cognizant of her toileting needs.  In closing, Plaintiff lamented being unable to continue in the nursing profession after some 30 years as a result of having to take pain medication simply to function.  She also questioned the prospect of landing other

jobs once prospective employers were made aware that she would be taking prescribed pain medications. The hearing was then adjourned. (Tr. pp. 67-72). After considering the documentary evidence of record and the testimony adduced at the administrative hearing, on April 20, 2016, the ALJ issued a written decision in which he concluded that Plaintiff was not disabled within the meaning of the Social Security Act and, therefore, was not entitled to Part A Medicare coverage.

Plaintiff broadly challenges the sufficiency of the evidence supporting the Commissioner's decision that she was not disabled, and thus ineligible for Medicare coverage, essentially arguing that the licensing requirements of her past occupation as a licensed practical nurse preclude her from working while taking narcotic pain medication and that neither the ALJ nor the VE was able to find her a position that she could perform while being so medicated. Plaintiff takes issue with the ALJ's suggestion that she was non-compliant with her prescribed pain medications; that given the risk of addiction, she takes said medications only when she cannot function; and that when she does take the medications, she is unable to drive or to perform the activities of daily living. For the reasons that follow, the Court believes that the ALJ's decision is based upon a proper consideration of the evidence that was before him and that the additional medical records that Plaintiff appended to her complaint do not undermine the ALJ's decision or warrant a remand of her case.

The evidence developed in the proceedings below reveals that Plaintiff suffered from a number of significant medical conditions going back to her childhood and earlier adult years in the form of a right nephrectomy, radiation, and chemotherapy following the discovery of a Wilms' tumor in 1968. Those treatments resulted in radiation damage and

adhesions requiring additional surgeries in subsequent years.  However, those conditions did not prevent from working as an LPN up until the alleged disability onset date of November 2, 2010.  *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995)(citing *Fraga*, 810 F.2d at 1305 n. 11 (ability to work despite pre-exiting conditions supports ALJ's finding of no disability).  What the relevant objective evidence does show is that Plaintiff underwent fusion surgery to counter the effects of L5-S1 spondylolisthesis on November 3, 2010 and was released three days later, fully ambulatory and tolerating a normal diet.  Plaintiff was seen post-operatively by Dr. Donner on November 19, 2010 who declared that her back "feels great" and that she was "doing fine" except for mild sciatica on the right which was improving day by day.  X-rays taken on December 6, 2010 demonstrated no surgical complications.  The following day, Dr. Donner characterized Plaintiff as "doing quite well" with only diminishing sciatica on the right.  Plaintiff complained of tailbone pain when she was followed by Dr. Pitre on December 21, 2010 and the assessment was back pain status post surgery.  However, no adverse physical examination findings were noted.  Only nighttime coccygeal pain that was expected to resolve was documented by Dr. Donner on January 4, 2011.

By February 7, 2011, Plaintiff was said to be doing "much better" with only periodic but diminishing achiness in the coccyx and rare, extremely mild sciatica-type symptoms that were not even significant enough to require treatment.  On March 14, 2011, the solid fusion was said to have "cured" her back pain and three days later, Dr. Donner issued her a requested work release as she was "doing great."  Plaintiff was prescribed Soma to address occasional but minimal coccygeal soreness on April 25, 2011 and she reported needing pain

medication only occasionally on May 11, 2011 and that when she did take it, she could walk upwards of two miles.

On August 1, 2011, Plaintiff continued to be characterized as "doing well" with only activity-related, intermittent coccygeal pain, taking Soma once per week and experiencing minimal to absent symptoms. Once again, she requested and was issued another work release by Dr. Donner with a restriction against lifting more than 30 pounds to minimize coccygeal pain and to return on an as needed basis. She was counseled on weight loss exercises on October 10, 2011. Plaintiff was seen by Dr. Pitre for follow-up care on December 15, 2011 with the sole complaint being insomnia on some nights. On that same date, notwithstanding the largely unremarkable and optimistic findings that had been recorded in the wake of Plaintiff's fusion surgery, Dr. Pitre reported to TRSL that Plaintiff was completely disabled from nursing or any other occupation, citing in support thereof physical examination findings of scoliosis, a reduced range of motion to an unidentified part of her anatomy, and multiple scars.

Plaintiff was treated at Lady of the Sea on March 1, 2012 for flu-like symptoms and again on May 11, 2012 for low back pain, elevated cholesterol, and Sweets Syndrome. Her medications were adjusted on August 7, 2012 and she requested to be weaned off Duragesic. When next seen by Dr. Pitre on December 4, 2012, Plaintiff was characterized as "doing well" on MS Contin and her medication regimen was thus continued. Dr. Pitre also completed additional paperwork on this date indicating that Plaintiff was permanently disabled secondary to spondylolisthesis and chronic pain and had not been released to return to work. Despite that sobering prognosis, Plaintiff was said to be doing well on her prescribed medications which included 15-minute walks twice per week. Again her medications were

described as effective in controlling her lower back pain on May 27, 2013.  Following a check-up with Dr. Pitre on August 5, 2013, the diagnosis was only low back pain and Plaintiff was maintained on her medications.  Further TRSL paperwork was completed on this date.

Plaintiff returned to Dr. Pitre on November 4, 2013 for treatment of a cough and nausea/vomiting.  Her pain was rated as a mere "3," medications were reportedly working well, and a physical examination of the musculoskeletal system produced normal findings.  As directed, Plaintiff was seen again by Dr. Pitre on February 10, 2014 and continued to be described as "doing well."  A physical examination was normal except for the existence of scoliosis and Plaintiff was to return in three months.  By May 12, 2014, Plaintiff was still "doing well," was ambulating normally, and was in no acute distress.  On September 10, 2014, Plaintiff was still characterized as "doing well," having discontinued the use of Vicodin, taking Soma only rarely, and using MS Contin on an as needed basis.  Plaintiff was next seen by Dr. Pitre on December 8, 2014 for treatment of a rash; no adverse physical examination findings were recorded.

At her next return visit to Dr. Pitre on March 11, 2015, Plaintiff continued to be "doing well"; a physical examination was normal and Plaintiff's medications were continued.  Plaintiff's consultative evaluation with Dr. Davidson went forward shortly thereafter at which she complained of constant low back pain, worse with any activity.  Otherwise, she was said to be doing "pretty good" and reported using her prescribed pain medications sparingly and irregularly.  Upon physical examination, Plaintiff had a good range of motion throughout except for the lumbar spine and positive straight leg raising but there was no tenderness or swelling and with good stability of the ankles, feet, and toes.  Tandem walking was good and Plaintiff could heel-to-toe walk.  Functionally, Plaintiff was capable of

sitting/standing/walking and exertion as tolerated, could lift/carry 10 to 20 pounds, and was unable to bend but could perform numerous other postural maneuvers. She could also drive and travel by herself. Plaintiff was seen one final time by Dr. Pitre on July 10, 2015 and was diagnosed with low back pain, anxiety, and acute bronchitis. The necessary TRSL paperwork was once again completed wherein the doctor indicated that Plaintiff was no longer able to function as a nurse.

What the objective medical evidence points to is an individual who, despite significant medical issues in her younger years, was successfully able to function as a nurse up until November of 2010.[1] She then underwent fusion surgery on November 3, 2010 followed by an expected period of uneventful convalescence that was said to have "cured" her back pain to the extent that she herself requested and was issued an unrestricted clearance to return to work approximately four months later. Thereafter, Plaintiff's improvement continued such that she used pain medication only sporadically and when she did, she could walk upwards of two miles. Only minimal symptoms persisted on August 1, 2011 when Plaintiff was issued a second work clearance with a restriction against lifting greater than 30 pounds. That restriction was the only functional limitation that was placed on Plaintiff's activities by any of her treating physicians in their contemporaneous treatment records, a proper consideration in a Social Security proceeding. *Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995); *Vaughan*, 58 F.3d at 131.

In finding that Plaintiff was capable of performing a limited range of light work, the ALJ gave significant weight to the opinions of Drs. Donner and Davidson as being entirely

---

[1] Despite alleging a disability onset date of November 2, 2010 in her application for DIB and related paperwork (tr. pp. 117, 145), elsewhere Plaintiff indicated that she worked up until November of 2011 (tr. p. 139) and that her disability began in that month. (Tr. p. 144).

consistent with the objective evidence of record. (Tr. pp. 21-22). The restrictions that those doctors had noted are consistent with the performance of light work as defined by the Regulations. 20 C.F.R. §1567(b). The opinions of Dr. Pitre, on the other hand, were given little weight as being inconsistent with the other evidence of record and her own contemporaneous treatment notes. That was wholly within the ALJ's province as the responsibility for weighing the evidence and determining the credibility of witnesses' testimony and doctors' opinions lies with the ALJ in the first instance. *Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991); *Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 129 (5th Cir. 1991); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990). The views expressed by Dr. Pitre in the various TRSL forms that she periodically completed are also not determinative in light of the otherwise modest findings set forth in the doctor's treatment records. *See Brunson v. Astrue*, 387 Fed.Appx. 459, 462 (5th Cir. 2010)(citing *Frank v. Blackburn*, 326 F.3d 618, 620 (5th Cir. 2003)). In any event, whether Plaintiff was deemed to be unable to work under the particular rules applicable to the TRSL is not binding upon the Commissioner, 20 C.F.R. §404.1504, and whether she was disabled within the meaning of the Social Security Act is the ultimate issue that is reserved to the Commissioner. 20 C.F.R. §404.1527(d)(1).

In finding that Plaintiff was not disabled, the ALJ also considered the effectiveness of Plaintiff's medications and the regularity with which she took them. Here, it must be remembered that the Regulations impose an affirmative obligation upon claimants to follow the treatment that is prescribed to them, 20 C.F.R. §404.1530, because "[a] medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling." *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987)(footnote omitted). As respects

pain, it is considered disabling under the Social Security Act only when it is "... constant, unremitting, and wholly unresponsive to therapeutic treatment," and the mere existence of pain or the fact that an individual is unable to work without experiencing some pain or discomfort does not qualify.  *Hames v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983)(emphasis added).

On nearly every occasion that she was seen subsequent to her fusion surgery in November of 2010, Plaintiff was said to be doing well on her prescribed medication regimen which was effective in controlling her pain while increasing her functionality and with no mention of side-effects or concerns expressed by her treating practitioners that she was at significant risk of addiction.  Even by the time of the administrative hearing, Plaintiff testified that her extended-release pain medications allowed her to cook, do laundry, go grocery shopping, and walk upwards of half a mile.  Plaintiff's ability to engage in such activities is not indicative of someone who is unable to perform any work activities whatsoever.  *Fraga*, 810 F.2d at 1302 (ability to walk approximately one-half block, to attend church, and to drive 20 to 30 miles per week supported finding of "not disabled").  As this case was decided at the fifth step of the §404.1520 analysis, whether Plaintiff was unable to return to her past job as a nurse while taking prescribed pain medication is not relevant.  In light of the body of evidence that was before him, and particularly the absence of more significant findings during the relevant time period, *Clayborne v. Astrue*, 260 Fed.Appx. 735, 737 (5th Cir. 2008), the ALJ's determination that Plaintiff was capable of performing a limited range of light-level work was not an unreasonable one.  The VE's testimony that Plaintiff was capable of performing various light-level jobs in light of her impairments constitutes substantial

evidence that she was not disabled within the meaning of the Social Security Act.  *Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988).

The additional medical evidence that Plaintiff attached to her complaint does not alter the foregoing conclusion.  The Court can order a case remanded for consideration of such medical evidence "… only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. §405(g).  In order to justify a remand, three criteria must be satisfied.  *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Pierre v. Sullivan*, 884 F.2d 799, 803 (5th Cir. 1989).  First, the evidence must be "new" and not merely cumulative of what is already in the record.  *Szubak v. Secretary*, 745 F.2d 831, 833 (3rd Cir. 1984).  Second, the evidence must be "material" such that there is a "reasonable possibility" that the evidence would have changed the outcome of the Commissioner's decision.  *Latham v. Shalala*, 36 F.3d 482, 483 (5th Cir. 1994)(citing *Chaney v. Schweiker*, 659 F.2d 676, 679 (5th Cir. 1981)).  The materiality requirement also contains a temporal element that the evidence relate to the time period for which benefits were denied and not merely concern a subsequently-acquired disability or the deterioration of a condition that was not previously disabling.  *Leggett*, 67 F.3d at 567; *Latham*, 36 F.3d at 482.  Finally, the claimant must demonstrate good cause for not having incorporated the new evidence into the prior administrative record.  *Pierre*, 884 F.2d at 803.

Three pieces of medical evidence attached to Plaintiff's complaint – a clinic note from Dr. Ronald Leo dated December 17, 2015, an EGD report of December 30, 2015, and the report of a hepatobiliary scan conducted on January 8, 2016 (rec. doc. pp. 1, 61-64, 65-68, 69-70) – share a common characteristic and can thus be addressed together.  All three of those reports were generated prior to the date that the ALJ issued his written decision on

22

April 20, 2016 and well prior to the AC's denial of review on May 4, 2017. As Plaintiff fails to establish good cause for not having presented these records to the Commissioner during the pendency of the administrative proceedings below, a remand for consideration of them is not warranted.

The remainder of the medical records appended to Plaintiff's complaint were all generated in July of 2017 and post-date the Commissioner's decision. On July 10, 2017, Plaintiff presented to Dr. Pitre for a quarterly follow-up evaluation and medication refills, further complaining of stomach issues and a ganglion cyst on her left middle finger and requesting a CT scan of her back. A review of the doctor's treatment note reveals that the stomach and cyst concerns were of recent vintage and thus do not satisfy the materiality criteria necessary to justify a remand. (*Id.* at p. 58). As respects the lumbar spine, although Plaintiff complained of increased pain, it appears that the primary reason for requesting an updated CT scan was because the x-ray studies that were then extant were outdated for use in her pursuit of Medicare coverage. (*Id.*). Dr. Pitre also completed the required TRSL paperwork on this date, identifying severe scoliosis as the reason Plaintiff was unable to return to her previous work as a nurse. (*Id.* at pp. 53-54). As those opinions do not speak to Plaintiff's ability to perform the light-level jobs that were identified by the VE at the administrative hearing, that form is not material because there is no reasonable possibility that it would have changed the outcome of the Commissioner's decision. *Latham*, 36 F.3d at 483. On July 21, 2017, Plaintiff was formally notified that she would continue receiving disability retirement benefits from TRSL. (*Id.* at p. 52).

Pursuant to a referral from Dr. Pitre, on July 25, 2017, Plaintiff was seen by Dr. Donald Gervais of the Southeast Neuroscience Center in Gray, Louisiana. (Rec. doc. 1, pp. 27-31).

23

There, Plaintiff presented with a "... new complaint ... of neck pain with numbness, tingling sensation to [the] right hand ... that has been progressing over [the] last several months." (Rec. doc. 1, p. 27). As this consultation relates to a newly-acquired condition, it also fails to satisfy the materiality criteria necessary to warrant a remand. On the same day as Dr. Gervais' evaluation, Plaintiff underwent x-ray studies of the lumbar spine which revealed the anterior fusion at L5-S1, bilateral facet arthropathy at L3-4 and L4-5, and moderate levoscoliosis. (*Id.* at p. 43). Similar studies of the cervical spine showed left neural foraminal narrowing at C5-6 and anterior spondylosis at C4-5 and C5-6. (*Id.* at p. 43). Bloodwork was also done. (*Id.* at pp. 44-47). Plaintiff underwent SSEP testing on July 28, 2017 which revealed normal latencies with stimulation of the medial nerves but a delayed response bilaterally to the tibials. (*Id.* at pp. 40-41). Plaintiff was seen by Dr. Pitre one final time on July 31, 2017. (*Id.* at pp. 33-38). Normal muscle tone was found throughout and both the proximal and distal muscle groups were strong bilaterally. (*Id.*). The assessment was lumbar pain, a neurogenic bladder, gait imbalance, and cervicalgia. (*Id.*). An EMG was also performed which demonstrated bilateral median neuropathy at the wrists, resulting in a recommendation for nocturnal splints and right followed by left carpal tunnel injections. (*Id.* at p. 39). Once again, as this evidence pertains to a subsequently-acquired condition, it fails to justify a remand. While the Court is not unsympathetic to Plaintiff's plight, in light of the highly deferential standard of review applicable to Social Security proceedings, *Fortenberry v. Harris*, 612 F.2d 947, 950 (5th Cir. 1980), it will be recommended that the ALJ's decision be left undisturbed.

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that Plaintiff's motion for summary judgment be denied, that Defendant's motion for summary judgment be granted, and that Plaintiff's suit be dismissed.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996)(en banc).[2]

New Orleans, Louisiana, this __8th__ day of _____August_____, 2018.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

---

[2] *Douglass* referenced the previously-applicable 10-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to 14 days.